ANDREWS & CO. ET AL. v. UNITED STATES (No. 1733).[1]

1. CONSTRUCTION, PARAGRAPH 620, TARIFF ACT OF 1913—CHANGE IN LANGUAGE DOES NOT NECESSITATE CHANGE IN MEANING—"TAGUA NUTS."

It is not every change in the terms of a statute from the one for which it is a substitute that results in a change of its general purpose. The change from the language "vegetable ivory in its natural state" (par. 596, tariff act of 1909) to the language "tagua nuts" (par. 620, tariff act of 1913) does not show any change in meaning.

2. CONSTRUCTION, PARAGRAPH 620, TARIFF ACT OF 1913—LEGISLATIVE HISTORY AS AID TO—"TAGUA NUTS."

An argument was made for a duty to be levied on ivory-nut slabs in the tariff act of 1913. The act contains no such provision, but admits "tagua nuts" free. This may be taken as an indication that Congress did not intend to levy a duty upon ivory-nut slabs.

3. TAGUA NUTS CUT INTO SLABS.

Tagua nuts cut into slabs as a preparation for the making of buttons or like products, with no indication that the cutting into slabs has either devoted the nut to a new use or withdrawn it from any general uses to which it was adapted, are admissible free of duty as "tagua nuts" (par. 620, tariff act of 1913) and not dutiable as nonenumerated partly manufactured articles (par. 385).

United States Court of Customs Appeals, April 23, 1917.

APPEAL from Board of United States General Appraisers, Abstract 39744.

[Reversed.]

*B. A. Levett* for appellants.

*Bert Hanson*, Assistant Attorney General (*Thomas J. Doherty*, special attorney, of counsel), for the United States.

[Oral argument October 19, 1916, by Mr. Levett and Mr. Doherty.]

Before MONTGOMERY, SMITH, BARBER, DEVRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

---

[1] T. D. 37199 (32 Treas. Dec., 550).

The merchandise in question in this case consists of pieces of the tagua nut sawed into various sizes, intended for use in the manufacture of buttons. The importers in their brief describe these as "tagua nuts cut into slabs," whereas the Government's brief described them as "slabs of the substance called vegetable ivory."

Duty was assessed upon the merchandise at the rate of 15 per cent ad valorem as a nonenumerated manufactured article under paragraph 385 of the act of 1913. The importers protested, claiming the merchandise to be free of duty as tagua nuts under paragraph 620 of the act. The board overruled the protest and the importers now appeal.

The provisions of the act of 1913, which may be deemed to have some relevancy to the case, are here quoted:

369. Ivory tusks in their natural state, or cut vertically across the grain only, with the bark left intact, 20 per centum ad valorem; manufactures of ivory or vegetable ivory, or of which either of these substances is the component material of chief value, not specially provided for in this section, 35 per centum ad valorem. * * *

385. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for in this section, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not provided for in this section, a duty of 15 per centum ad valorem.

620. Tagua nuts.

The free list provision, paragraph 596 of the act of 1909, reads:

Ivory tusks in their natural state or cut vertically across the grain only, with the bark left intact, and vegetable ivory in its natural state.

The tagua nut is the nut of the ivory palm produced in South America and in Africa. The Standard Dictionary defines "ivory nut" as "the seed of a tropical American palm (*Phytelephas macrocarpa*), which, when dry, becomes hard and white, and when polished resembles ivory."

Vegetable ivory is described in the Standard Dictionary as "the albumen of ivory nuts, used for many kinds of ornamental work." "Ivory nut" is described in the Century Dictionary as "the seed of *Phytelephas macrocarpa*, a low-growing palm, native of South America."

The New International Encyclopedia defines "vegetable ivory" as—

The fruit of a handsome palm, *Phytelephas macrocarpa*. * * * The fruit, which is as large as a man's head, consists of six or more four-celled aggregated drupes, and contains numerous somewhat triangular nuts as large as a hen's egg. The kernels of these nuts, called *corrozzo nuts* in commerce, are so hard and white, and resemble ivory so greatly, that the name vegetable ivory is particularly applicable. They have of late come into extensive use with turners in the manufacture of buttons, umbrella handles, and small trinkets.

Thorpe's Dictionary of Applied Chemistry says of the "tagua nut":

The stone seed of several species of the South American genus of palms, *Phytelephas*, are known as tagua nuts and are worked as vegetable-ivory.

"Tagua" is defined in the Standard and Century dictionaries as "the ivory palm."

The testimony of the witness, A. E. Whitehouse, the importer, is as follows:

Q. (By Mr. LEVETT.) What is this merchandise?—A. Tagua nut.

Q. Can you tell us something about what the tagua nut is?—A. It is the kernel or seed of a palm.

Q. Where does it grow?—A. This particular thing grows in Africa.

Q. Imported from Africa?—A. Yes, sir.

Q. Have you a sample of the nut as it drops from the tree?—A. Yes. [Witness produces sample.]

Q. The merchandise you imported is the kernel of this article you now produce?—A. Yes, sir.

\*        \*        \*        \*        \*        \*        \*

Q. Have you had one of these nuts cut in two half pieces, showing just what it looks like?—A. I have.

Q. Those half pieces have half the kernel in there also?—A. Have half of the kernel; yes, sir.

\*        \*        \*        \*        \*        \*        \*

Q. Then, the article as imported is the kernel of the illustrative Exhibit B further sawed?—A. Further sawed.

Q. That is all that has been done to it?—A. That is all, except it may be tumbled.

Q. By (Mr. HARDISON.) How is it processed; what is done to it before it comes here?—A. Before imported?

Q. Yes.—A. The only way of getting it.

Q. How is it processed abroad before it comes here?—A. The natives gather it from the trees, using a machete in taking the kernel out.

Q. How do they get it out?—A. With a machete. Give it a sharp blow, open it, tear it apart.

Q. Then?—A. Then it is put to a circular saw and sawed into pieces.

Q. Into how many pieces do they saw them?—A. According to the shape they are, four or five different pieces.

Q. What else is done to it?—A. That is all.

Q. Do they take this outside part off?—A. In some cases they do and in some cases they do not.

Q. The product comes in clean?—A. No; no, not exactly. We wish it did, but it don't.

Q. (By Mr. LEVETT.) What is made out of these pieces after they come in?—A. Buttons.

Q. They are sold as raw product to the button makers?—A. Yes, sir.

We gather from these definitions and from the testimony that the terms "ivory nut" or "tagua nut," which we think are interchangeable, mean the *seed* of the palm, which, when dry, become hard and white. This is indicated by the definition given in Thorpe's Dictionary of Applied Chemistry and in the New International Encyclopedia. We think, however, it is not very material whether the term "tagua nut" may be construed to include the outer shell, which is removed in harvesting, and is apparently no part of the tagua nut of commerce, for if the latter construction be given it, it would fall within a line of cases well recognized as authority. Under a tariff

provision of 1897, placing in the free list shellfish, it was held that so-called condensed clams, which are made by removing the clams from the shell, grinding them into fine particles, partially evaporating the moisture and then sealing the product in tin cans, were to be admitted free.   (T. D. 26367.)   It was said:

Shellfish have long been on the free list, and the provision has been always construed by the board, the department, and the Attorney General to cover prepared or preserved shellfish.   Some of the things which have been classified as shellfish are dried oysters and abalones, dried or smoked oysters in oil, canned lobsters, canned clams, and shelled lobsters preserved in vinegar.   *   *   *

We are of opinion that the reducing of the clams to small particles, which seems to be practically the only preparation in this case, has not removed them from the class of "shellfish" in the tariff sense.   Analogous cases have arisen in the construction of the fish schedule under which so-called cream of codfish, consisting of codfish, skinned and boned, which had been subjected to the further processes of cutting and shredding, was held to be dutiable as "fish, skinned or boned."

This case was followed by the board in T. D. 27791.

In United States *v.* John Duncan's Sons (2 Ct. Cust. Appls., 380; T. D. 32097) this court considered this question.   The subject matter in that case was tamarinds.   It was contended that the fruit was not tamarinds in its natural state, as it appeared that part of the shell had been removed.   It appeared also in that case that the importation in question was the tamarinds known to commerce and had been imported for many years in the manner in which that in question was imported, although there were small importations in its green state.   The cases cited above were referred to in this opinion as follows:

A somewhat analogous question has arisen with reference to the free-list provision for shrimps and other shellfish, and it has been held that the removal of such shellfish from their shells, and even cooking and preparing them for use, does not take them out of the free list and place them under the other provisions of the tariff law.

It was held, however, to be unnecessary to rest that case on analogy, but to the extent stated the shellfish cases were cited with approval.

In Zanmati *v.* United States (153 Fed., 880) the subject involved was whether vegetables sliced for the purpose of facilitating the natural drying operation, then cleaned and dried in the sun, were dutiable as vegetables in their natural state or vegetables prepared or preserved.   It was held that they were dutiable as vegetables in their natural state.   It is conceived by the writer of this opinion that had the provision under consideration read simply "vegetables," the case would have been clearer for the importer.   But it seems clear that if the term "vegetables in their natural state" admits of vegetables sliced and dried, the term "vegetables," without such restrictive term "in their natural state" would have admitted the like product.

Counsel for the Government states in his brief the position that a provision for tagua nuts could not be made to cover slabs of vegetable ivory which have been produced by boring out or otherwise removing the kernel of the tagua nut and sawing it by means of a circular saw, saying:

Certainly this process results in transforming the nut into something that is physically and commercially different. It might be as reasonably argued that a provision for trees in the tariff would cover sawed lumber. This seems so plain a proposition that no extended argument is necessary.

With all deference to counsel for the Government, we think that he is not only stating the proposition too strongly, but that the authorities lead to the exactly opposite conclusion. The shellfish cases to which we refer are strongly in point. So far as the court intimated an opinion at all, in United States *v.* John Duncan's Sons, supra, it was intimated that the eo nomine provision for shellfish was broad enough to include shellfish of any form imported, where there were no words of limitation in the free list provision for shellfish.

In Neuman *v.* United States (4 Ct. Cust. Appls., 64; T. D. 33310) it was held that an eo nomine provision for hams fixed the rate upon hams which had been cooked, which had had the bone removed, and then tinned, the entire meat of a single ham only being preserved and the shape of a ham in outline also being preserved. It was said:

The meat is, of course, the valuable part of the ham, and that is the real importation in any event; and when the entire meat of a single ham is packed alone in a single tin, not changed in any particular except that it has been cooked and the bone removed it seems to the court that the contents of the tin may still be called a ham within the meaning of that term as used in the cited paragraph.

Again, in United States *v.* Winter & Smillie (4 Ct. Cust. Appls. 392; T. D. 33836), the court had under consideration a provision reading, "seeds:  *  *  *  St. John's bread or bean,  *  *  *." The appraiser reported the merchandise as St. John's bread, but furthermore reported that the chopping process had destroyed the bean as seeds. He therefore made return that the importation was not entitled to free entry under paragraph 662, but was dutiable as prepared edible fruit at 2 cents per pound. No oral testimony was introduced, but an inspection of the sample satisfied the court that the seeds were almost entirely intact, relatively few of them having been broken. We quote from the decision:

As already stated, the present importation is a mixture of chopped pith and seeds, and the question arises whether or not it is properly a manufacture of carob pods rather than St. John's bread itself. The record gives no information concerning the form in which the article is commonly imported. It does not appear, however, that the present mixture differs in collective name, character, or use from the entire pods. The only difference is that the pods have been coarsely chopped into fragments; but these have all the uses of the entire pods, and no more. Nothing has been added in substance to the pods by this process and nothing taken away; and the material in

hand rightly seems to be covered by the same collective name which applies to the pods themselves.

This language is particularly applicable in the present case. The substance which gives character to the tagua nut is unquestionably the kernel obtained in the harvesting of the cut from the tree. Nothing has been added in substance to that kernel, and nothing has been taken away. The material in hand is the material of the tauga nut and nothing else.

A case very strongly in point is Brown *v.* United States (6 Ct. Cust. Appls., 415; T. D. 35977). That case arose under a provision of the free list for soya beans. There was also a provision for beans, prepared, preserved, or contained in tins, jars, bottles, or similar packages. The importation in question consisted of soya beans which had been cooked and salted and tinned. It was said:

Whatever may have been the treatment to which the goods were subjected, it is clear from the report of the Department of Agriculture that their preparation, cooking, or salting did not alter their status as beans or change or modify them sufficiently to prevent their identification as soya beans. It is a fact that they are something more than soya beans in the *natural* state, but on the record they are not something more than soya beans in the sense that they are something else. That is to say, they are soya beans advanced in condition, but not so far advanced as to be converted into a new article—citing Neuman *v.* United States, supra, United States *v.* Winter & Smillie, supra, and Stein *v.* United States (6 Ct. Cust. Appls., 154; T. D. 35397).

It was added:

It may be conceded that a person ordering soya beans from a seed house would hardly expect to receive merchandise of the kind imported. On the other hand, it is equally true that the importation might well be regarded as a proper delivery of soya beans ordered for use as a food.

It was held:

The principle is well established that in determining the classification of goods an eo nomine designation must, unless a legislative intent to the contrary is clearly indicated, be preferred to terms of general description and to enumerations which are broader in scope and less specific.

We think the case cited should be held controlling.

Government's counsel refer to the recent case of Stone & Co. *v.* United States (7 Ct. Cust. Appls., 173; T. D. 36492). In that case currants which had been ground to a pulp for use in making wine were held to have lost their identity. The description given to the subject of adjudication there is sufficient to distinguish that case from the present. It was said:

The importation has completely lost its identity as currants. It is an indeterminate mass or pulp. It is, in fact, a material prepared or made from currants, the ultimate use of which is in the manufacture of wines. Its general and more diversified uses as currants have thus been destroyed or limited.

This is precisely what has not happened to the merchandise the subject of inquiry here. The tagua nut, although cut into slabs, has

not been devoted to any other or different use. The cutting has not established a new use nor has it circumscribed the uses to which the tagua nut as a whole could have been devoted. There is no intimation or indication that it has any other use or purpose than the preparation of the tagua nut for the making of buttons or like products, and for this purpose there is no indication that the cutting into slabs has either devoted it to a new use or withdrawn it from any general uses to which it was adapted.

But it is further said by counsel that the change in the language of the free list provision from "vegetable ivory in its natural state" to "tagua nuts" indicates an intention to change the character of the article admitted free. It is not every change in the terms of a statute from the one for which it is a substitute that results in a change of its general purpose. The rule is one of construction merely in any case, but even as a rule of construction it has its limitations and qualifications.

In Endlich on Interpretation of Statutes (sec. 381) it is said:

The importance of the principle which attaches slight weight to mere changes of phraseology is particularly manifest in the construction of statutes that are substantially reenactments, or that are intended as revisions or consolidations of others. As to such enactments, it is well settled in this country that, in the absence of an intention to change the law, sufficiently clearly appearing from other guides of interpretation, or unless the change is such as, in itself, to render such an intention manifest and certain, mere variations in the language of such enactments from the language of former statutes on the same subject, under which the law has become settled, will not be regarded as intended to call for a different construction.

And in section 401 of Sutherland on Statutory Construction it is said:

* * * Whether the change be by omission, addition, or substitution of words, the principle applies. Where changes have been introduced by amendment it is not to be assumed that they are without design. Every change of phraseology, however, does not indicate a change of substance and intent. The change may be made to express more clearly the same intent or merely to improve the diction. The change is often found to be the result of carelessness or slovenliness of the draftsman. The changes of phraseology may result from the act being the production of many minds, and from being compiled from different sources. Hence the presumption of a change of intention from a change of language is of no great weight, and must mainly depend on the intrinsic difference as resulting from the modification. A mere change in the words of a revision will not be deemed a change in the law unless it appears that such was the intention. The intent to change the law must be evident and certain; there must be such substantial change as to import such intention, or it must otherwise be manifest from other guides of interpretation, or the difference of phraseology will not be deemed expressive of a different intention.

Let us see just what is urged by counsel. We quote:

Under the act of 1909 vegetable ivory nuts were free, because they were literally vegetable ivory in its natural state, and slabs such as are here in question cut from said nuts were also admitted free under the construction assigned to the phrase "vegetable ivory in its natural state." Congress has now stricken from the tariff law the provision

for the vegetable ivory in its natural state; consequently of the commodities which were previously admitted free only one is now admissible, namely, tagua nuts. In the old law all vegetable ivory was admitted free of duty providing it had not been advanced beyond the condition of vegetable ivory. In the new law only the natural product, tagua nuts, is admitted free of duty.

The distinctions sought to be made between the ivory nut or the tagua nut and the substance of vegetable ivory in its natural state is one which we think unsound. It is, we think, clear enough that "ivory nut" or "tagua nut" are, as applied to the substance here in issue, interchangeable terms. It would not be difficult to say that vegetable ivory in its natural state might have been held to include only such ivory nuts or tagua nuts as had not been in any way advanced from the natural state; but even this contention would not, under the authorities, have been sound, as the mere cutting into slabs of the substance, in no way changing its uses, and particularly if for convenience in shipping or handling, would not have changed it from its natural state. But however that may be, when the term "tagua nut" was employed as a substitute for "vegetable ivory" in the statute (and by substitute we mean a substitute for the phraseology of the former provision), there is nothing to indicate that it was not intended to give to the term its natural import and it would admit of the tagua nut in any form which, under the rules of construction which we have adopted, would entitle it to admission.

It does not seem to me logical to say that this vegetable ivory, which in its first state had the form of a tagua nut or an ivory nut, could have been admitted in the form of slabs under the act of 1909 in the presence of the limitation "in its natural state," and that it can not now be equally admissible where the law simply provides eo nomine for the tagua nut, the usable part of which is nothing other than or different from vegetable ivory that was admitted under the act of 1909. If the construction adopted admitting slabs of the tagua nut under such phraseology as appeared in the act of 1909 was permissible, then the substitution of the term "tagua nut," which described the identical thing which would thus have been admitted under the name "vegetable ivory," in no way changed or affected the meaning of the law. The same thing which was admissible in the form of slabs under the law of 1909 when called vegetable ivory would be admissible in the form of slabs under the law of 1913 when called tagua nuts, and, as has been pointed out, if any doubt should exist under the law of 1909, it would be obviated under the act of 1913 because the restriction of the article to importation in its natural state is eliminated.

The suggestion is made that the history of the enactment of this measure in 1913 indicates that the purpose was to restrict the free provision to the whole nut. It is true that an argument in favor of

a duty on ivory-nut slabs was made, and the request for a duty of 35 per cent made. But this request was not acceded to in the rate nor in a distinct provision placing such slabs on the dutiable list. On the contrary, tagua nuts were enumerated in the free list, and whatever are covered by those words are admitted free. The fact that attention was called to ivory-nut slabs and a duty asked for on them, when considered with the fact that such slabs were not mentioned in the statute, affords evidence that the request passed unheeded. True, there is the catch-all provision present in every tariff act, but it will not, we think, do to say that this is to be construed as bringing within its terms everything that importers or others may have asked to have made dutiable. The question is what the unrestricted use of the term "tagua nut" imports. As we have attempted to show, the mere fact that such nuts have been sliced does not withdraw them from classification under such eo nomine provision.

The decision of the Board of General Appraisers is *reversed.*

### CONCURRING OPINION.

Smith, Judge, concurring: I am in doubt as to whether the substitution of the designation "tagua nuts" for "vegetable ivory in its natural state" was made because Congress considered the designations as equivalents, or whether that substitution was made because of a legislative intention to confine paragraph 620 to tagua nuts in their condition as they came from the tree. The benefit of that doubt I must, of course, give to the importers. I therefore concur in the conclusion reached in the foregoing opinion.

### DISSENTING OPINION.

Judges De Vries and Martin dissent from the foregoing decision, for reasons stated in the following opinion:

The merchandise in hand consists of pieces of the hard, white albumen of tagua nuts, sawed into various suitable sizes, intended for use in the manufacture of buttons. The importers in their brief describe these as "tagua nuts cut into slabs," whereas the Government's brief describes them as "slabs of the substance called vegetable ivory." These several descriptions serve to define the issue in the case, which is, whether the merchandise is tagua nuts, or is a distinctive substance called vegetable ivory derived from tagua nuts.

The collector held against the importers' claim, and assessed duty upon the merchandise at the rate of 15 per cent ad valorem as a nonenumerated manufactured article under paragraph 385 of the tariff act of 1913.

The importers protested, claiming the merchandise to be free of duty as tagua nuts under paragraph 620 of the act.

The Board of General Appraisers overruled the protest, and the importers now appeal.

For convenience of reference the following germane paragraphs are copied from the present tariff act or from former tariff revisions:

*Act of March 3, 1883.*

(Free list.)   Ivory and vegetable ivory, unmanufactured.

*Act of October 1, 1890.*

(Free list.)   618. Ivory and vegetable ivory, not sawed, cut or otherwise manufactured.

*Act of August 27, 1894.*

(Free list.)   519. Ivory, sawed or cut into logs, but not otherwise manufactured, and vegetable ivory.

*Act of July 24, 1897.*

(Free list.)   584. Ivory tusks in their natural state or cut vertically across the grain only, with the bark left intact, and vegetable ivory in its natural state.

*Act of August 5, 1909.*

(Free list.)   596. Ivory tusks in their natural state or cut vertically across the grain only, with the bark left intact, and vegetable ivory in its natural state.

*Act of October 3, 1913.*

369. Ivory tusks in their natural state, or cut vertically across the grain only, with the bark left intact, 20 per centum ad valorem; manufactures of ivory or vegetable ivory, or of which either of these substances is the component material of chief value, not specially provided for in this section, 35 per centum ad valorem;   *   *   *.

385. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for in this section, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not provided for in this section, a duty of 15 per centum ad valorem.

(Free list.)   620. Tagua nuts.

It thus appears that the term "tagua nuts" was first used by Congress in the tariff revision of 1913.   The testimony, the exhibits, and the standard authorities show that tagua nuts are the kernels or seeds of the fruit of certain palm trees which flourish in South America and which grow to some extent in northern Africa.   The following definitions and descriptions thereof are quoted as illustrative of the testimony and exhibits in the case.

Standard Dictionary:

*Tagua.*—The ivory palm.

*Ivory palm.*—The tree that bears ivory nuts.

*Ivory nut.*—The seed of a tropical American palm (*Phytelephas macrocarpa*), which when dry becomes hard and white, and when polished resembles ivory.   See *Vegetable ivory.*

*Vegetable ivory.*—The albumen of ivory nuts, used for many kinds of ornamental work.

Murray's English Dictionary:

*Vegetable ivory.*—The hard albumen of the nut or seed of a South American palm, *Phytelephas macrocarpa,* which resembles ivory in hardness, color, and texture, and is used for ornamental work, buttons, etc.

Century Dictionary:

*Tagua* (native name in Colombia).—The ivory palm, *Phytelephas macrocarpa.* See *Ivory-nut* * * *.

*Ivory nut.*—The seed of *Phytelephas macrocarpa,* a low-growing palm, native of South America. The seeds are produced, 4 to 9 together, in hard clustered capsules, each head weighing about 25 pounds when ripe. Each seed is about as large as a hen's egg; the albumen is close-grained and very hard, resembling the finest ivory in texture and color; it is hence called *vegetable ivory,* and is often wrought into ornamental work. It is also known as *corozo.*

Encyclopædia Britannica:

*Ivory.*—Vegetable ivory, etc., * * *. The plants yielding the vegetable ivory of commerce represent two or more species of an anomalous genus of palms, and are known to botanists as *Phytelephas.* * * * The plant is severally known as the "tagua" by the Indians on the banks of the Magdalena, as the "auta" on the coast of Darien, and as the "pullipunta" and "homero" in Peru. * * * The fruit consists of a conglomerated head composed of six or seven drupes, each containing from six to nine seeds, and the whole being inclosed in a walled woody covering forming altogether a globular head as large as that of a man. * * * In its very young state the seed contains a clear, insipid fluid, which travelers take advantage of to allay thirst. As it gets older this fluid becomes milky and of a sweet taste, and it gradually continues to change both in taste and consistence until it becomes so hard as to make it valuable as a substitute for animal ivory. * * *

New International Encyclopedia:

*Ivory, vegetable.*—The fruit of a handsome palm, *Phytelephas macrocarpa,* which grows in the Peruvian Andes, on the banks of the river Magdalena, and in other parts of South America. * * * The fruit, which is as large as a man's head, consists of six or more four-celled aggregated drupes, and contains numerous somewhat triangular nuts as large as a hen's egg. The kernels of these nuts, called *corrozzo nuts* in commerce, are so hard and white, and resemble ivory so greatly, that the name vegetable ivory is particularly applicable. They have of late come into extensive use with turners in the manufacture of buttons, umbrella handles, and small trinkets.

Thorpe's Dictionary of Applied Chemistry:

*Tagua nut.*—The stony seed of several species of the South American genus of palms, *Phytelephas,* are known as tagua nuts and are worked as vegetable ivory.

The following is a part of the testimony of witness A. E. White-house, who is the virtual importer of the present merchandise:

Q. (By Mr. LEVETT.) What is this merchandise?—A. Tagua nut.

Q. Can you tell us something about what the tagua nut is?—A. It is the kernel or seed of a palm.

Q. Where does it grow?—A. This particular thing grows in Africa.

Q. Imported from Africa?—A. Yes, sir.

Q. Have you a sample of the nut as it drops from the tree?—A. Yes. (Witness produces sample.)

Q. The merchandise you imported is the kernel of this article you now produce?—A. Yes, sir. (Sample is offered in evidence as an illustrative exhibit. Admitted and marked illustrative Exhibit A.)

Q. Have you had one of these nuts cut in two half pieces, showing just what it looks like?—A. I have.

Q. Those half pieces have half the kernel in there also?—A. Have half of the kernel; yes, sir.

(Samples are offered in evidence, admitted, and marked illustrative Exhibit B.)

Q. Then the article as imported is the kernel of the illustrative Exhibit B further sawed?—A. Further sawed.

Q. That is all that has been done to it?—A. That is all, except it may be tumbled.

Q. (By Mr. HARDISON.) How is it processed; what is done to it before it comes here?—A. Before imported?

Q. Yes.—A. The only way of getting it.

Q. How is it processed abroad before it comes here?—A. The natives gather it from the trees, using a machete in taking the kernel out.

Q. How do they get it out?—A. With a machete. Give it a sharp blow, open it, tear it apart.

Q. Then?—A. Then it is put to a circular saw and sawed into pieces.

Q. Into how many pieces do they saw them?—A. According to the shape they are; four or five different pieces.

Q. What else is done to it?—A. That is all.

Q. Do they take this outside part off?—A. In some cases they do, and in some cases they do not.

Q. The product comes in clean?—A. No, not exactly. We wish it did; but it don't.

Q. (By Mr. LEVETT.) What is made out of these pieces after they come in?—A. Buttons.

Q. They are sold as raw product to the button makers?—A. Yes, sir.

The foregoing quotations, when considered together, lead properly to the conclusion that the name "tagua nuts" applies more specifically or distinctly to the whole nuts or seeds as they issue from the fruit, and that the ivory-like albumen of the nuts, when cut into slabs to serve as a manufacturing material, is more exactly designated as "vegetable ivory." It is true that these several names are somewhat loosely used, and that sometimes the term "vegetable ivory" is applied indifferently to whole nuts and sawed slabs alike; especially is this true of the term "vegetable ivory in its natural state." But, on the other hand, the name "tagua nuts" is not commonly applied to the slabs or pieces of nuts, but to whole or entire nuts only. The sawed slabs in question commonly bear the name of "vegetable ivory" only, and this is expressive of the manifest fact that such slabs are no longer really "nuts" in the ordinary application of that term, but are a new and distinctive substance or material which has been derived or produced therefrom. This distinction between the two terms applies with special force in the present case, since the legislative history of the enactment in question gives unmistakable evidence that Congress used the new term "tagua nuts,' not as a synonym of the former term "vegetable ivory" but as a term of contradistinction to it.

As already stated, the name tagua nuts first appeared in tariff legislation in the revision of 1913. Prior to that time the tariff provisions upon the subject related by name to vegetable ivory only.

The tariff act of 1883 placed "vegetable ivory, unmanufactured," upon the free list. The tariff act of 1890 gave free entry to "vegetable ivory, not sawed, cut, or otherwise manufactured." The tariff act of 1894 admitted "vegetable ivory" free of duty. The tariff act of 1897 gave free admission to "vegetable ivory in its natural state." The tariff act of 1909 reenacted this provision for the free entry of "vegetable ivory in its natural state."

The effect of the provision last stated was officially defined by the Treasury Department on December 16, 1911, in T. D. 32088, in these words:

SIR: I have to acknowledge the receipt of your letter of the 11th instant in which you state that the samples submitted by the department would, if imported through your port, be classified as follows:

The samples contained in envelope No. 1, which are vegetable ivory nuts, you state would be admitted free of duty under paragraph 596; that the samples contained in envelope No. 2, and which consist of ivory nuts sawed into slabs, would be assessed with duty as manufactures of vegetable ivory under paragraph 464 at the rate of 35 per cent ad valorem, and that the samples contained in envelope No. 3 would be classified as vegetable ivory button blanks at the appropriate rates provided under paragraph 427; that is, at the rate of three-fourths of a cent per line per gross and 15 per cent ad valorem.

The department concurs in the views expressed by you as to the classification of the samples contained in envelopes Nos. 1 and 3. The samples in No. 2 consist of ivory nuts sawed into slabs, and in the opinion of the department are entitled to admission free of duty under paragraph 596 as "vegetable ivory in its natural state," following the decision of the Board of United States General Appraisers of August 3, 1909, Abstract 21688 (T. D. 29946), wherein it was held that certain lotus lily roots which had been washed, cleaned, sliced, and dried were entitled to classification under paragraph 257 of the tariff act of 1897 as vegetables in their natural state.

Respectfully,                                          JAMES F. CURTIS,
(37653.)                                               Assistant Secretary.
COLLECTOR OF CUSTOMS, Rochester, N. Y.

It is therefore clear that when Congress began to revise the tariff in 1913, unquestioned free entry was enjoyed by the entire nuts and also by the sawed slabs produced therefrom, under the construction placed by the department upon the provisions for "vegetable ivory in its natural state," in the tariff act of 1909, and both articles were well-known subjects of import. See also Abstract 31142 (T. D. 33120). This fact was specifically mentioned in Report No. 5, page 720, House of Representatives, H. R. 3321, Sixty-third Congress, first session.

When the first bill for a tariff revision was introduced on April 7, 1913, in the House of Representatives, Sixty-third Congress, first session, H. R. 10, it contained the following dutiable provision in relation to this subject:

384. Ivory tusks in their natural state, or cut vertically across the grain only, with the bark left intact, and vegetable ivory in its natural state, twenty per centum ad valorem; * * *.

If this provision had been enacted it would have followed under the department's definition above quoted that both the entire nuts and the sawed slabs in question would have become dutiable in the tariff act of 1913 at the rate of 20 per cent ad valorem, whereas under the tariff act of 1909 both articles had been admitted free under the enumeration of "vegetable ivory in its natural state."

A reference to the hearings before the Ways and Means Committee (vol. 5, p. 5125) and to the briefs and statements filed with the Committee on Finance of the Senate (vol. 3, p. 1681) will disclose the fact that written arguments were publicly submitted to both committees and entered upon their records in favor of a differentiation between the entire nuts on the one hand and the cut slabs of vegetable ivory on the other, favoring the entry of the entire nuts free of duty and the imposition of duty upon the cut slabs.

As if actuated by this purpose, the tariff bill as reintroduced on April 21, 1913, H. R. 3321, entirely omitted the provision for duty upon "vegetable ivory in its natural state" (see par. 380 of the bill) and added to the free list the eo nomine provision for "tagua nuts" only. This action was explained in Notes on Tariff Revision, 1913 (S. Doc. No. 136), in the following note appearing under the provision for "tagua nuts" in paragraph 622 (as then numbered):

622. Tagua nuts.
1909—Paragraph 596.—This is a substitute for the provision in paragraph 596 of the present law for vegetable ivory in its natural state.

The provision for the free admission of tagua nuts was thus enacted in the tariff act of 1913 as a manifest substitute for the former provision for the free admission of vegetable ivory in its natural state, and the reasonable interpretation of the facts is that Congress intended thereby to discriminate between the natural ivory nuts upon the one hand and the prepared slabs of vegetable ivory on the other hand. Both of these articles were admitted free of duty under the name of "vegetable ivory in its natural state" under the tariff act of 1909, the board and the Treasury Department alike having held to that effect. If, therefore, Congress had desired to reenact that provision, it is reasonable to assume under the circumstances that the same language would have been employed for the accomplishment of that purpose. Instead of this, however, Congress expressly limited the new provision of the free list to "tagua nuts" only, omitting from the act any provision for vegetable ivory under that name. This new provision, which the committee designated as a "substitute" for the former one, was manifestly not designed to have the same force and effect as the provision for which it was substituted, but was designed to effect a change in the law by force of the substitution. This change was effected by reducing the free entry provisions

of the act so as to admit free of duty the natural or entire nuts only and not the slabs which might be prepared therefrom.

We think, therefore, that both the natural import of the terms in question and the clear inference from the legislative history of the provisions under review, lead to the conclusion that the present merchandise is not entitled to free entry as tagua nuts under paragraph 620, act of 1913, but instead thereof, being unenumerated in the present act and being manufactured in part, it is dutiable as a nonenumerated partly manufactured article under paragraph 385 of the act. In our opinion, therefore, the decision of the board should be affirmed.